May it please the court. My name is Brian Matsui on behalf of Plaintiff Eric Johnson. I would like to reserve two minutes. I'll try to reserve two minutes for rebuttal. We'll try to help you, but keep your eye on the clock. Thank you. The decision by the district court that Plaintiff Eric Johnson was not subject to an unconstitutional condition of confinement and a denial of medical treatment in violation of the Eighth Amendment cannot be sustained on either of that court's ruling two grounds. First, under even the district court's understanding of the facts, the 60 plus hour ordeal, two and a half days, the Plaintiff Johnson was subject to plainly constitute an objective violation of the Eighth Amendment under the precedent of this court and the precedent of the Supreme Court of the United States. The district court was only able to avoid finding a constitutional violation by comparing this case to out-of-circuit precedent and by focusing on cases in which there was only minor adverse conditions imposed upon those plaintiffs. And the district court viewed those cases in isolation. So it was nothing like the 60-hour incident. Second, the district court violated Rule 56F by granting summary judgment when defendants failed to turn over basic discovery that was plainly and explicitly asked by Plaintiff Johnson in his discovery request. He was not given incident reports and basic contemporaneous writings of what occurred on August 14th and lasted for 60 hours. The denial was because the request was untimely. Didn't he wait an extensive time, it seemed to me a year or more, before asking for any discovery? Then at the end, came on with some discovery requests after the pretrial order had shown that the discovery time had passed. Am I wrong in how that happened? That's not correct, Your Honor, because he had two discovery requests, one of which the defendants said was untimely. The first discovery request the defendants responded to, and the grounds upon which they objected to the precise discovery request in which he asked for incident reports and such contemporaneous writings, the defendants did not at all object on timeliness. So that argument would be waived on appeal. The defendants instead argued that the requests were vague and they weren't likely to read the relevant evidence and that it would be a threat to prison security. And what was the ruling on that? Well, the magistrate judge, which was then affirmed by the district court, held that that was proper, that that was all right. And that, as well, was error to allow. What is our standard of review of that decision? Well, the ruling on the discovery issue itself would be an abuse of discretion. But the court's ruling on whether or not summary judgment was appropriate under Rule 56F, because the district court never ruled upon a Rule 56F motion, would be de novo. So we would submit that this court's review is de novo in this case. On that precise issue relative to discovery in 56F? Yes. Yes, Your Honor. And those evidence that would have provided incident reports were crucial evidence. Under this court's Johnson v. Lewis decision, the court relied upon incident reports. And it quoted incident reports, which demonstrated that those could show the state of mind of the actual defendants in the case. And that was one of the critical rulings of the district court. There was error in this case to hold that there was, that the plaintiff had failed to satisfy the subjective component of the Eighth Amendment. Leaving to one side for the moment, and I'm not asking you to abandon the argument, but just leaving to one side for the moment, based on what we do know, what was so terrible about what happened that it rises to the level of a constitutional violation? The district court's basic recitation of the case and understanding of the case showed that there were very severe conditions. He was tightly handcuffed for 60 hours, which was two and a half days. And he was subject to further intentional tightening of the handcuffs, which left severe welts and bruises. But I understand the handcuffs were loosened and then tightened again. It wasn't as though they were tight and then tightened further, correct? That's correct. They were tightened very tightly. Then they were loosened by one guard for a short period of time. And then they were tightened again by the tactical support unit troops that came in to the facility. He was given inadequate food and water during that 60 hours. What food and water was he given? Well, the record is not entirely clear on that, in part because of where this case was basically decided by the district court. He presumably knows what food and water he got. He didn't need discovery for that. He could have attested to it. What did he get? Well, he basically says that he was not given enough. There were over six-hour periods where he was not given. There was a water cooler, and only one person was allowed to come up, and there were small Dixie cups. They basically were not allowed to get water for a serious period of time. But we would also submit that under the Jones case, under Rule 56F, this court has also held that it's appropriate for discovery, particularly in these conditions of confinement types of cases, to basically allow the plaintiff to explore the sheer scope of the conditions of confinement that he was subjected to. Because even though he would have been aware of that, he, for example, wouldn't be aware of, you know, what type of necessarily food they gave him or why they gave him certain water or why they gave him certain food or whether or not the food was old, which might be an incident report. So what was asked was what food and water did he receive, and that's something he has to know. So the lack of discovery isn't going to change that. It might change the explanation behind it, but he's going to know what he got. Right. But we were clear on that. I don't know that you can attribute that to a 56F problem. But we would submit that he was sufficiently clear on, in his pleadings, the fact that he was given inadequate food and water, but he was also kept in a frame. I'm trying to figure out what inadequate means. Like one peanut butter sandwich every 24 hours, ham and cheese sandwich every six hours. What did he get? He said that he got a bologna sandwich, Your Honor, and I'm not certain of the exact amounts that he received. But I do believe that this is something during a, you know, in a 60-hour period in which, you know, he submitted affidavits where people passed out, he may not know exactly everything that occurred during that period of time. And discovery certainly can help. But this is an individual action rather than a class action. This is an individual action, but incident reports can still demonstrate the scope and the sheer scope of the condition of confinement which he was put in. But he was in a 40-by-40 concrete cell with 70 other prisoners. So in addition, he was forced to lay face down on a prison yard that was basically full of flowing reclaimed water. So we would submit that the district court's comparison of this case to other cases. Now, let me come back to the reclaimed water. He was forced to lie down on the grass. On the grass, that's correct. How wet was the grass at that time? Well, he has basically submitted that it was, that it was, there's no evidence as to the degree of how wet it was. It was just watered with effluent. Yes, but that would be reclaimed water, which I don't believe was. But it wasn't two inches or five inches deep on the allegation that I could see. No, that is not in the allegation. Or was it even damp? Do we even know that? Well, we do know that what he said is that it was wet and that it was, and the court should certainly on summary judgment take the facts in light most favorable to him in this situation. And what time did he lie down on it? Was this due? Was it from the watering? Do we know? We don't know. But he was basically, he says that he was there for over two hours in the 100-degree heat in Arizona in August. Couldn't have been much water on the ground at that point. Pardon? Couldn't have been much water on the ground at that point. 100-degree temperature? It certainly depends on how much it was flowing, Your Honor. If I'd like to reserve the time. Yes, save your time and then we'll give you a chance to respond. Thank you. Good morning, Your Honor. My name is Paul Cardin. I'm an assistant attorney general for the state of Arizona here today representing seven mid- to high-level officials of the Arizona Department of Corrections. Could you address that discovery issue? It seemed to me, the way I read the record, maybe I'm confused that the discovery requests were made after the cutoff date, all the discovery requests. That's correct, Your Honor. And that was allowed. I mean, they could have cut them off. And then it was determined that they were untimely. Is that correct? I think you've got it about right, Your Honor. That's a typical case of no good deed going unpunished. When the discovery first came in, granted they were timely, trying to make a good faith effort to keep things going. I did not interpose an immediate timeliness objection. When it became clear that Mr. Johnson was not going to be appeased by any response I was going to give, I put that forward in response to his motions to compel. So how do we work through the Rule 56-F issue then? Well, although he cited to the rule, Your Honor, he hardly hit any of the benchmarks for a proper Rule 56 motion. He continued to suggest that what he needed was this broad background material, incident reports, perhaps an inmate letter, health needs requests, just sort of random documents that might give him some background about the incident in general. He sued mid- to high-level officials. The risk of harm they were assessing was a disturbance that had gone from one half of an 800-person prison complex to the other half of it over a full day. They were concerned about inmates being hurt, about assaults, about things like that. They could not. There's simply no realistic way to conceive of how these people would have been aware of the unique circumstances of Mr. Johnson. Well, he's not alleging it was unique to him that he was individually abused. He does cite to the one episode of the handcuffs being tightened or retightened or so forth. But for the most part, the treatment that he says he receives is the treatment that a whole group of people received. And that's what some of the discovery did focus on, and we produced records relating to all complaints and grievances relating to treatment of inmates as well as ones that were directed specifically to the defendants. The fact remained that they were not aware of his particular circumstances on that date. But were they aware of circumstances of prisoners generally? Were they aware that the prisoners were in the grassy area and were told to lie down, face down, for the two hours in the sun? Presumably somebody was aware of that. The deputy warden, I think, is the only one who had some kind of operational oversight relating to the entire disturbance. The timeline is rather significant here. Seven in the morning, there's a disturbance in Mr. Johnson's unit. They try to keep him inside. Come noontime, the other half of the prison complex begins, goes into a state of a riot. It's at that point that they're moved outside when it's become clear that they have to get better control on what's going on. So what's happened now is they're out in the grass while the disturbance is in full swing. So we're under the Whitley standard. So to the extent that he is not being subjected to any kind of malicious attempt to harm kind of situation, I don't think any of this. He's candidly admitted that nothing adverse came of his having been placed in the grass. So we get – I think we get pretty clearly through that point to the point where he's alleging that the tactical support officer re-cinched his. The other big allegation has to do with being kept for two days or 48 hours, something like that, in the – along with something like 40 other prisoners. So that was also, I take it, a common condition. And the explanation offered, it was necessary while the cells were searched. Well, that would suggest it's – again, it's not simply a line officer that's making that decision. Presumably higher authorities are involved, consulted, and are aware that the prisoners collectively are being kept in unusual conditions so that the search can be conducted. I'm not quarreling with your argument yet, anyway, that there's a justification for that. But the argument that, gee, he only named supervisory types and they couldn't be responsible for what happened to him, he's not really complaining about what happened to him uniquely. It's more general complaints. I hope somebody in the prison system knows what's going on. And I would – I would assure you that there were individuals who were involved in the immediate decisions relating to management of the prisoners. The fact remains that Mr. Johnson never put forward specific discovery requests to try to find out who made the decisions that affected him. Notwithstanding the arguments of counsel, he never made a specific request. Who were the TSU officers who were appointed to my day room? Who was the sergeant who was telling them what to do? None of this ever happened. It was those first interrogatories where he asked for the broad-spectrum documents like all these day reports or whatever they were. Are you trying to say that those interrogatories, the first ones that were done after the cutoff time, wanted broad-spectrum reports rather than specificity relative to his incident with the lockdown? Is that what you're saying? Well, I don't know that his – his first request basically was give me all the incident reports, everybody who can support my client. Yeah. We just wanted all reports relative to the whole thing. Everything, Your Honor, with no – nothing to suggest that it might be matters that these defendants were aware of, nothing that they had authored, nothing that came across their desk. It was a total wide open give me everything you've got. What was it that the magistrate judge ordered to be produced? He parsed it through. He – his initial partial grant of the motion to compel, he said you should disclose specific complaints, including grievances, as well as matters relating to these particular defendants. That we did. I'm sorry. He also asked for an in-camera review of certain confidential Department of Corrections policies, which after that review, the – we produced to the – to the – to Mr. Johnson. Did he receive them prior to the time he was required to respond to your summary judgment motion? Yes, he did, Your Honor. He responded earlier than he needed to. We produced within the time frame, and he never took the opportunity to either try to supplement or suggest that he needed – you know, he needed more time to integrate those materials into his response. So his only concern could be that the first request was not totally granted. I mean, he received some discovery. The only – the only complaint that he could have that we would review at all was the fact that he made this broad spectrum request, which the – which the magistrate went through and made certain findings and gave him what the magistrate thought was appropriate. I think that's true. And what's all the more compelling, Your Honor, is the fact that the magistrate specifically invited him once he received the smaller universe of documents, if he thought that those gave him a, shall we say, a jumping-off point to say, you know, this particular individual, there seems to be some issue with what he knew or what he did, then he invited Mr. Johnson to come back to him and make another request, you know, to reopen discovery and see what else might be subject to him. And all this discovery took place after the time limit had expired for discovery. That's absolutely correct. He was pro se at the time, as I remember. Yes, he was, Your Honor. Your Honor, it's our position that the district court acted well within its discretion when it denied further discovery. Mr. Johnson did not diligently pursue discovery at all during the time that he was allowed to. Then by the time we filed our motion to summary judgment, he never tailored his subsequent discovery request to show why he needed that specific discovery to rebut the points we put forward in our motion for summary judgment. And most importantly, I think, to the extent that the allegations relate to the tactical support officers and the re-cinching of his cuffs, that occurred after he'd already been injured. The allegations are clear that he'd already had cuts, he was already swelling. So it's not as if that tactical support officer, to the extent he existed, harmed him physically. He made it a little more uncomfortable. We have 60 hours in a day room in Yuma, Arizona. As Your Honor has observed, when he's out in the field, that's when it's 100 degrees. You bring them inside to do the best you can in adverse circumstances. You keep them safe, you keep them secure while you go through interviews and securing all the dormitories before you can return any of these individuals back to their living situations. This would certainly be a different case if he'd asked to identify these tactical support officers or the people giving the specific orders that affected him. Your Honors, he did not. The district court did, in fact, specifically rule on his 56F motion in footnote 2 of its order. It said it would not consider further opening up discovery, that discovery had been long closed. So that would, at least with respect to the discovery aspect of the case, we believe that should be an abuse of discretion standard. And as far as the Eighth Amendment violations, it's our position, as the district court held, that the risk of harm that faced Mr. Johnson was not so substantial so as to create an Eighth Amendment violation. And building on that, Your Honors, the fact remains that when you submit to high-level officials, they are concerned about substantial risk of serious harm to the entire inmate population and not to one single inmate with his unique difficulties. If there are no further questions. Okay. Thank you very much. Mr. Matsui, you saved a little time. Thank you. With respect to the magistrate judge's invitation to file additional discovery requests, if he needed it, that was really an illusory invitation because, basically, immediately after the district court, the magistrate judge ruled that the defendant's responses were deficient on February 23rd, the defendants moved for summary judgment on February 28th, 2005. So there was really no ability for him to go through and seek additional discovery. His initial discovery requests were pending. Why couldn't he make the discovery requests and say in his opposition to the summary judgment motion, these discovery requests are pending and I need this information to respond to this argument, so on and so forth? Well, he did invoke Rule 56-F in his opposition to summary judgment, and he did say that he needed the discovery that was pending in his to support his case. And his initial request, you know, explicitly asked for incident reports that related to the events that occurred on that day. And so even if it's at discretion that we review that particular decision by the magistrate? Certainly, even under an abuse of discretion, that was satisfied because he was a pro se plaintiff that should have been given the discovery that he requested in that circumstance, particularly when the court basically decided that he was not entitled to discovery based upon security concerns, in which there was basically no proffer by defendants as to the extent of the security concerns, and there was no examination by the magistrate judge or the district court as to, one, whether or not the discovery was material, and, two, whether or not that specific report or that specific document would have adversely affected prison security. It certainly can't be that just a putative security privilege can basically prevent all discovery for a plaintiff. Okay. Thank you very much. Thank both sides for good arguments and useful arguments. The case of Johnson v. Savage is now submitted for decision. The next case on the argument calendar is United States v. Raspberry.
judges: Brunetti, Fletcher, Clifton